IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| GALE E. BOLDEN, | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 4:13-cv-00032 |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner, | ) | |
| Social Security Administration, | ) | By:    Joel C. Hoppe |
| Defendant. | ) | United States Magistrate Judge |

## REPORT AND RECOMMENDATION

Plaintiff Gale Bolden asks this Court to review the Commissioner of Social Security's (the "Commissioner") final decision denying her application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383f. Bolden primarily objects to the Commissioner's conclusion that she can perform "light" work, including her past work as a Certified Nursing Assistant. She urges the Court to reverse the Commissioner's decision and award benefits, or to remand her case for further administrative proceedings. This Court has authority to decide Bolden's case under 42 U.S.C. §§ 405(g) and 1383(c)(3), and her case is before me by referral under 28 U.S.C. § 636(b)(1)(B) (ECF No. 16).

After reviewing the administrative record, the parties' briefs, and the applicable law, I find that substantial evidence supports the Administrative Law Judge's ("ALJ") final decision that Bolden is not disabled. Therefore, I recommend that the Court affirm the Commissioner's decision.

## I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to supplemental security income. *See* 42 U.S.C. §§ 405(g),

Case 4:13-cv-00032-JLK-JCH   Document 19   Filed 07/23/14   Page 1 of 31   Pageid#: 1393

1383(c)(3); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether the ALJ applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence," *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951). Ultimately, this Court must affirm the ALJ's factual findings if " 'conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled.' " *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal quotation marks omitted)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in

2

sequence, whether the applicant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See* 20 C.F.R. § 416.920(a)(4); *see also Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983). The applicant bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Bolden filed this SSI application on November 15, 2011. (R. 68.) She was 52 years old, had at least a twelfth grade education, and once worked as a Certified Nursing Assistant ("CNA"). (*See* R. 68, 72; *see also* R. 38.) Bolden alleged that she could not work anymore because of an injured rotator cuff, "congestive heart failure, [a] broke[n] disc in [her] back, [a] bulging disc, a pinched nerve in [her] neck causing her to drop things, and hypertension (uncontrolled)." (R. 243, 68.) A state agency denied her application initially and upon reconsideration. (R. 79, 90.)

Bolden appeared with counsel at an administrative hearing before an ALJ on December 4, 2012. (R. 33.) She testified as to her past work, her current impairments, and the limits those impairments had on her daily activities. (*See generally* R. 37–54.) A Vocational Expert ("VE") also testified as to Bolden's past work and to the type of jobs that she could still perform given her age, education, work history, and limitations. (*See generally* R. 52–61.)

In a written decision dated March 14, 2013, the ALJ found that Bolden was not disabled after November 15, 2011. (R. 28.) The ALJ found that Bolden suffered from "severe" degenerative disc disease, "right shoulder difficulty," and hypertension. (R. 21.) Although

3

Bolden alleged "left shoulder problems and hand grip problems," the ALJ found that those impairments were "non-severe" because they did not cause "functional limitations lasting or expected to last [for] a continuous period of at least 12 months." (*Id.*) He also found that Bolden's mood disorder was a "non-severe" impairment because it did not significantly limit her ability to perform basic work activities. (R. 21–22.) None of Bolden's severe impairments, or combination of impairments, met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 22–23.)

The ALJ next determined that Bolden had the residual functional capacity ("RFC")[1] to do a limited range of "light work"[2] with occasional overhead reaching and "less than frequent" stooping or balancing as long as she avoided "concentrated exposure to hazards." (R. 23; *see also* R. 27.) At step four, the ALJ concluded that Bolden could return to her past work as a CNA as she actually performed it because, according to the VE's testimony, Bolden "performed this job at the light exertional level." (R. 26–27.) Alternatively, the ALJ found at step five that Bolden could perform other light duty occupations that existed in the national economy, such as

---

[1] "RFC" is an applicant's ability to work "on a regular and continuing basis" despite his or her limitations. Soc. Sec. Ruling 96-8p, 1996 WL 374184, at *1 (Jul. 2, 1996). The RFC takes into account "all of the relevant medical and other evidence" in the applicant's record, 20 C.F.R. § 416.945(a), and reflects the "total limiting effects" of the person's impairments, *id.* § 416.945(e). The ALJ in this case found that Bolden could still: (1) occasionally lift 20 pounds; (2) frequently lift 10 pounds; (3) sit, stand, and walk for "about six hours" in an eight-hour day; (4) occasionally reach overhead bilaterally; and (5) "engage in postural activities, to include stooping and balancing, on a less than frequent basis"; but (6) must avoid concentrated exposure to hazards. (R. 23.)

[2] "Light work" involves "lifting no more than 20 pounds at a time" but "frequently" lifting or carrying objects weighing up to 10 pounds. 20 C.F.R. § 416.967(b). Work in this category often requires "a good deal of standing or walking" or "involves sitting most of the time with some pushing and pulling of arm and leg controls." *Id.* A person who can perform light work generally can also perform "sedentary" work. *Id.*

4

unarmed security guard, retail salesperson, and parking lot attendant. (R. 27.) The Appeals

Council declined to review the ALJ's decision (R. 1), and this appeal followed.

## III. Facts

*A.    Medical Records*

Bolden's medical records reveal a history of back pain, shoulder pain, and degenerative

changes in her spine and right shoulder. In July 2006, for example, Bolden had an MRI of her

lumbar spine after reporting to the emergency department with back pain. (R. 436–37.) The MRI

revealed  "intervertebral disc narrowing . . . particularly at L2-L3 and to a lesser extent at L4-

L5." (R. 436.) There was a "mild to moderate circumferential disc bulge" at L2-L3 and L4-L5.

(R. 437.) The left neural forminal opening at L4-L5 also was "partially narrowed by disc

material and spurring." (*Id.*) The reviewing physician noted that the degenerative changes at L4-

L5 may indicate "slight infraction of the nerve root," and he recommended an ultrasound for

further evaluation. (*Id.*) X-rays taken on October 5, 2006, of Bolden's right knee showed mild

arthritic changes. (R. 428–29.)

On August 26, 2011, Bolden reported to the emergency department complaining of "a

sharp, shooting pain in [her] back down [the] left leg causing her to fall." (R. 318.) On exam, Dr.

Jonathan Logan, M.D., observed that Bolden's back was tender with palpable spasms bilaterally.

(R. 319.) She had "normal, full, active" range of motion in all extremities. (*Id.*) Dr. Logan

prescribed pain medications and muscle relaxants and instructed Bolden to visit her primary care

provider. (R. 320.)

On January 6, 2012, the rescue squad delivered Bolden to the emergency department

where she complained of a persistent "moderate right frontal headache" and muscle spasms in

her lower back. (R. 878.) On exam, Bolden's back was non-tender and no muscle spasms were

noted. (*See* R. 882.) She was prescribed muscle relaxants and instructed to contact her primary care provider in the next few days. (R. 886.)

On January 11, 2012, Bolden reported to the emergency department complaining of "horrible pain" in her upper back. (R. 980.) She described the pain as 8/10, "crampy," and intermittent. (*Id.*) Dr. Rebecca Kirsch, D.O., offered to admit Bolden for further observation, but Bolden insisted that she wanted to go home. (R. 981.) Dr. Kirsch diagnosed "back pain ? [of unknown] etiology" and discharged Bolden home with pain medications and instructions to visit her primary care provider. (*See* R. 983, 984.) She also recommended that Bolden "exercise [her] abdominal muscles to help strengthen [her] back." (R. 984.)

Bolden first complained of shoulder pain and difficulty lifting her right arm on January 31, 2012. (*See* R. 903.) Bolden informed the attending physician that she "ha[d] been dropping things with her right arm for about a year now and was told that it could be a pinched nerve problem." (R. 906.) She also said that the pain "seem[ed] to radiate to her back." (*Id.*) On exam, Dr. Fredrick Odoo, M.D., noted that Bolden's "right shoulder region [was] diffusely tender" with "limited" range of motion in the right arm. (*Id.*) Her back was not tender to palpation, and she had full strength and intact sensation in all extremities. (*See id.*)

An x-ray of Bolden's right shoulder taken the same day revealed "mild degenerative arthritis of the acromioclavicular joint." (R. 911.) An x-ray of her spine confirmed multilevel degenerative osteoarthritis, including "narrowing at the L2-L3 disc interspace," but no spondylolysis or spondylolisthesis. (R. 912.) Left-sided disc protrusion at C5-C6 was noted. (R. 915.) Dr. Odoo "suspected [an] injury to the rotator cuff," but he did not recommend any particular course of treatment. (R. 918.) He prescribed pain medications, instructed Bolden to

contact her primary care provider, and discharged her home in "stable and improved" condition. (R. 916, 922.)

On March 21, 2012, Bolden reported to the emergency department with "chest pain continuous for the past 2 days that started in her left upper chest area and radiates down her left arm and into her left back." (R. 949.) On exam, Nurse Karin Hall, C.N.P., observed that Bolden had normal range of motion in three extremities, but that she was unable to lift her left arm above her head "due to pain in [the] left upper chest and left arm area with movement." (*Id.*) Bolden was prescribed pain medications, instructed to contact her primary care provider, and discharged home in "stable and improved" condition. (R. 954.)

Bolden returned to the emergency department on March 26, 2012, complaining of chest pain unabated by prescription strength medication. (R. 943.) The attending physician, Dr. Siddarth Khanna, M.D., noted that he "would like to find out if the patient is chronically using opiates, given the fact that she is requiring high doses of medication to control her pain." (R. 944.) Dr. Khanna admitted Bolden to the hospital to "rule out acute coronary syndrome" as the source of her chest pain. (*Id.*) She was discharged the next day after being diagnosed with "chest pain, possibly secondary to gastroesophegal reflux." (R. 942.) Treatment notes do not document that Bolden complained of any musculoskeletal discomfort during this visit. (*See* R. 942–44.)

On April 3, 2012, Bolden appeared at her primary care provider's office with her left arm in a sling. (R. 1031.) She reported a recent injury to her left shoulder and an inability to grip with her left hand. (*Id.*) Nurse Shannon Runion, F.N.P., observed "pain with palpation and movement of the left shoulder" and "pain with palpation of [the] posterior neck and essentially [the] entire back and paraspinal musculature." (*Id.*) Bolden requested "an increase to stronger pain medication," and Nurse Runion switched Bolden from Lortab to Percocet. (R. 1031, 1032.) She

7

instructed Bolden to "not obtain narcotic[s] from other clinics/providers" except in an emergency, to use Flexeril at bedtime, and to treat her pain with massage and heat. (R. 1032.)

On July 23, 2012, Bolden reported to the emergency department complaining of left shoulder pain "from an old rotator cuff injury" and back pain "from an old bulging disc." (R. 965.) Bolden said that she had run out of her pain medication and was unable to see her primary care provider because she did not have health insurance. (R. 967.) On exam, Justin Gambini, P.A., observed full range of motion in all extremities. (R. 968.) His examination of Bolden's right shoulder was "normal": she had good abduction adduction, normal muscle strength, and no significant joint laxity. (*Id.*) She experienced "pain with ROM [range of motion] with abduction of the left shoulder past 50 degrees." (*Id.*) Gambini also noted pain over the lower spine, but no trigger points or muscle spasms. (*Id.*) He diagnosed chronic back and shoulder joint pain. (R. 968, 976.) Bolden was prescribed pain medications and instructed to follow up with her primary care provider. (*See id.*)

On September 9, 2012, Bolden reported to the emergency department complaining of "back pain that caused her to fall." (R. 1102.) She said that she had experienced "even worse back pain bilateral across [the] lumbar spine" since falling the day before. (*Id.*) On exam, Dr. Logan observed that Bolden was "tender all across lumbar spine into [the] sacrum" and that she "jump[ed] to light touch." (R. 1103.) He did not note any palpable muscle spasms. (*See id.*) Bolden had "normal, active, full" range of motion without point tenderness in her neck and all extremities. (*Id.*) Dr. Logan ordered x-rays of Bolden's pelvis, which showed "degenerative changes about the hips, slightly more pronounced on the left" side. (R. 1104.) He prescribed pain medications, instructed Bolden to follow up with her primary care provider, and discharged her home by herself in "stable" condition. (R. 1103, 1105.)

8

On September 20, 2012, Bolden reported to the emergency department complaining of pain in her neck and right shoulder. (R. 1069.) She also complained of extreme drowsiness and lethargy, which at least one provider personally observed. (R. 1072.) On exam, William Singleton, P.A., noted "normal, active, full" range of motion without tenderness in Bolden's neck and all extremities. (R. 1073.) Multiple x-rays taken that day showed "at most mild narrowing" and "degenerative changes with spondylosis" at C5-C6 bilaterally, as well as osteoarthritis in the right shoulder. (R. 1078.) Noting similar results from x-rays taken in January 2012, the reviewing physician reported that these arthritic changes "can be associated with rotator cuff disease" and suggested that an MRI would be useful for further evaluation. (R. 1078, 1170.)

Bolden was also admitted to the hospital to monitor her fatigue and bradycardia. (*See* R. 1079.) Consulting cardiologist Dr. Girish Purohit, M.D., observed that Bolden's primary problem "seem[ed] to be chronic pain of musculoskeletal etiology." (R. 1042.) He also noted that Bolden had "generalized osteoarthritis everywhere and it seems to be quite incapacitating." (*Id.*) On exam, Dr. Purohit observed that Bolden was "in significant pain" and experienced "tenderness to palpation over the cervical spine." (*Id.*) Dr. Purohit ruled out myocardial infarction and opined that Bolden could be discharged "from a cardiac standpoint." (R. 1043.)

On discharge, Dr. Tony Farmer, M.D., diagnosed Bolden with "fatigue and lethargy possibly secondary to medication misuse" by combining benzodiazepines with blood-pressure medications. (R. 1047.) He also noted that Bolden's reported "gait instability" was "likely secondary to her fatigue from overmedicating herself." (*Id.*) Dr. Farmer opined that Bolden's right shoulder and neck pain was "likely secondary to muscle strain versus some cervical degeneration" and arthritis in the shoulder joint. (*Id.*) He also noted that the hospital would "set

9

[her] up for outpatient ortho evaluation." (R. 1048.) Dr. Farmer provided pain medications and instructed Bolden to follow up with her primary care provider. (*See* R. 1047.)

On October 16, 2012, the rescue squad delivered Bolden to the emergency department with complaints of abdominal pain "for the last few days." (R. 1237, 1239.) On exam, Bolden's back was non-tender and she had "normal, active, full" range of motion in her neck and all extremities. (R. 1240.) She did not report any musculoskeletal discomfort during this visit. (*See* R. 1240.) Nonetheless, Bolden "ask[ed] if the physician [was] 'going to send [her] home with pain medication.'" (R. 1239.) The physician apparently declined that request. (*See* R. 1246.) Bolden was discharged in "stable" and "improved" condition with a referral to Dr. Rodrigo Roldan, M.D., to be evaluated for gallbladder disease and gallstones. (R. 1246.)

Bolden returned to the emergency department on October 17, 2012, complaining of abdominal pain. (R. 1226.) On exam, Bolden's back was non-tender and she had "normal, active, full" range of motion in her neck and all extremities. (*Id.*) According to the attending physician's notes, Bolden reported "no joint or muscle ache" during this exam. (R. 1249.) Bolden was admitted to the hospital for "surgical consult and pain control" and had her gallbladder removed on October 18, 2012. (R. 1262.) Two days later, she was discharged home in "stable" condition with pain medications. (R. 1213–14.)

Bolden returned to the emergency department on October 22, 2012, complaining of vomiting and weakness. (R. 1215.) On exam, Bolden's back was non-tender and she had "normal, active, full" range of motion in all extremities. (R. 1218.) Shortly before discharge, Bolden began complaining of lower-back pain and muscle spasms unabated by medication. (R. 1222.) However, she soon "agreed that her pain is likely due to constipation post-op" and said that she felt ready to go home. (*Id.*) Bolden was discharged in "good" condition. (R. 1223.)

10

Bolden saw Dr. Said Iskandar, M.D., for "uncontrolled" hypertension on November 30, 2012. (R. 1279.) She reported back and joint pain, but denied stiffness in her neck and back, muscle pain, swelling in her joints, and "limitation of joint movement." (R. 1280.) Although she reported generalized weakness, Dr. Iskandar observed that Bolden had a normal gait and no weakness or decreased muscle tone in her extremities. (*Id.*)

Bolden's medical records document a much more limited history of symptoms related to hypertension or congestive heart failure. In October 2011, for example, Bolden reported to the emergency department complaining of "moderate difficulty breathing" exacerbated by walking. (R. 306.) She specifically denied chest pain on this visit. (R. 307.) X-rays and CT scans of Bolden's heart and lungs were "essentially normal." (R. 311–12.) Dr. Ghufran Syed, M.D., diagnosed and treated Bolden for "likely CHF [congestive heart failure] exacerbation." (R. 312.) He discharged Bolden home in "stable" condition and instructed her to follow up with her primary care provider. (R. 313.)

Bolden also complained of dyspnea in mid-January 2012. (*See* R. 937.) A CT angiogram revealed that Bolden's heart size was normal without pericardial effusion. (*Id.*) There was no pulmonary embolus, but Bolden's lung volume was noted to be "low." (*Id.*) A January 31, 2012, chest x-ray confirmed "unremarkable" cardiac outline and "very low lung volumes." (R. 913.) The reviewing physician, Dr. James Wills, M.D., recommended that the study be "repeat[ed] with good respiratory effort." (*Id.*) Dr. Odoo discharged Bolden home by herself in "stable" condition and instructed her to follow up with her primary care provider. (R. 916.) She was not in respiratory distress at that time. (*Id.*)

On March 21, 2012, Bolden returned to the emergency department complaining of chest pain radiating down her left arm. (R. 949.) Her heart and lung sounds were normal on exam. (*Id.*)

Dr. Wills noted that a current x-ray of Bolden's chest revealed "mild chronic lung disease" with "very shallow inspiration," but "no acute process." (R. 952.) Bolden's heart still appeared "normal." (*Id.*) Dr. Syed again discharged Bolden home in "stable and improved" condition and instructed her to follow up with her primary care provider. (R. 954.) She was not in respiratory distress at that time.

Bolden had a cardiology consultation while hospitalized for fatigue and bradycardia in September 2012. (*See* R. 1042.) Dr. Purohit noted that a cardiac stress test and electrocardiogram performed in March 2012 were both normal. (*See id.*) He opined that Bolden's "atypical pain [was] more related to cervical spine pathology with cervical osteoarthritis" than to a cardiac condition. (R. 1043.) On discharge, Dr. Farmer noted that extensive diagnostic testing "ruled out" any cardiac "irregularity."(R. 1048.) He also opined that Bolden's extreme fatigue and lethargy were unrelated to a cardiac condition. (R. 1047.) Rather, those symptoms were "possibly secondary to medication misuse" and "maybe some underlying sleep apnea." (*Id.*)

B.   *Bolden's Statements*

When Bolden applied for SSI in November 2011, she reported that she could not work anymore because of "congestive heart failure, [a] broke[n] disc in [her] back, [a] bulging disc, a pinched nerve in [her] neck causing her to drop things, and hypertension (uncontrolled)." (R. 68.) In December 2011, Bolden stated that on a typical day she took her pills, slept, and folded clothes if she washed them. (R. 212.) She never did housework or yard work. (R. 213.) On days that she felt like eating, she would make a sandwich, frozen food, or cereal. (R. 214.) Bolden did not take care of other people or animals, but her daughter kept a dog on the property. (R. 213.) Bolden could dress herself, but she needed her daughter's help to bathe. (*See id.*) She left the

12

house twice a month to go to church and rode in the car for 30 or 40 minutes to go grocery shopping. (R. 214, 215.) However, she did not drive because of "most of the meds [she's] on."

Bolden repeatedly stated that back pain and muscle spasms limited her ability to sit or stand for extended periods. (*See, e.g.*, R. 212, 213, 214, 216, 223–24, 254–55.) Bolden also described significant functional limitations, including an inability to walk more than "4 or 5 long steps" without resting for at least 10 minutes. (R. 217.) She reported "aching, stabbing, burning, and crushing" pain in her "lower left back" and "all the way down [her] left leg." (R. 223.) Sitting, standing, and laying down made the pain worse. (*Id.*) Her legs sometimes went numb, which caused her to fall down. (R. 223–24.) Bolden listed 16 current medications, some of which made her drowsy. (R. 224.) She said that the pain medications "don't work so at times [she] feel[s] like maybe [she] need[s] to overdose because the pain is so bad." (*Id.*) Bolden did not report any symptoms or limitations related to her pinched nerve, hypertension, or congestive heart failure in December 2011. (*See* R. 223–24; *see also* R. 212–19.)

On January 6, 2012, Bolden told a state-agency reviewer "that she ha[d] not had any treatment for problems in her back since 2006 when she was diagnosed." (R. 71.) When asked if she had "mentioned her back problems to anyone during her last 3 [or] 4 hospitalizations," Bolden "stated that she hasn't, but then quickly said, 'But I will go to the hospital for it now.' She then stated [that] her back and ambulation have been a problem since 2006 but [she] has had no [t]reatment since then."[3] (*Id.*)

_____

[3] According to the reviewer's notes, this conversation took place around 3:53 p.m. on January 6, 2012. (R. 71.) At 6:59 p.m., the rescue squad delivered Bolden to the emergency department with complaints of a persistent "throbbing," "10/10" headache, and muscle spasms in her lower back. (R. 878.) On exam, Bolden's back was non-tender and no muscle spasms were noted. (*See* R. 882.) She was provided muscle relaxants, instructed to follow up with her primary care provider in the next few days, and promptly discharged. (R. 886.)

13

On January 10, 2012, Bolden's long time friend and landlady, Lillie Hunsucker, completed a third party function report on Bolden's behalf. (R. 230.) Hunsucker said that it was a "good day" if Bolden could watch a movie on DVD. (R. 231.) Hunsucker indicated that Bolden "[took] care of pets or other animals." (*Id.*) She also reported that Bolden usually did not cook for herself, did not do housework or yard work, did not drive, and generally left the house only to go to "church when she is well enough for someone to take her." (R. 235; *see also* R. 236.)

In February 2012, Bolden told the state agency that her back was "getting worse" and that "sometimes it takes a while [for her] to get up." (R. 243.) She also reported that she had "been falling because [her] left leg gives out on [her]." (*Id.*) Bolden reported a "rotator cuff tear," which she said caused "pain in [her] neck and shoulder." (*Id.*) Bolden said that this pain had "no effect" on her ability to care for her personal needs. (R. 246.)

In April 2012, Bolden told the state agency that she recently "found out [her] rotator cuff on [her] left arm is damaged and giving [her] pain." (R. 251.) Bolden also reported that she had "been having chest pains" since mid-March 2012. (*Id.*) The only functional limitation that Bolden reported was an inability to "stand or sit for very long without having muscle spasms up [her] back." (R. 254.)

At the administrative hearing in December 2012, Bolden expressly denied "having any continued problems" with congestive heart failure by December 2012. (R. 47.) Bolden testified that she suffered "constant muscle spasms" in her lower back, pain radiating into her left leg, a torn right rotator cuff, and an injured left rotator cuff. (R. 39.) Bolden testified that she took Oxycodone or Percocet for pain and that these medications made her drowsy. (R. 40.) She also said that she took Diazepam, Flexeril, and Neurontin for muscle spasms, none of which helped "that much." (*Id.*) The muscle spasms interfered with her ability to sit, stand, or walk for more

14

than 20 minutes at one time. (R. 42.) Bolden also testified that her "shoulder difficulties" precluded her from reaching overhead, lifting more than 10 pounds, and pushing a vacuum cleaner. (R. 43.) Bolden initially testified that doctors had not recommended surgery to fix her rotator cuffs. (R. 43, 46.) However, she later clarified that she had been referred to an orthopedic surgeon, but could not afford to pay the consultation fee. (R. 61.)

Bolden testified that on a typical day she fixed a light breakfast, washed a dish, and took her medicine. (R. 44.) She also rested two or three times a day for a few hours each time. (R. 42.) She testified that she needed her daughter's help to bathe, do her hair, vacuum the house, and do the grocery shopping. (R. 44–45.) Bolden also testified that she left her home only to go to doctors' appointments "every few months" and to go to church for two hours twice per month. (R. 45.)

## IV. Discussion

Bolden argues that the ALJ made four errors. First, she argues that the ALJ improperly evaluated her credibility, primarily concerning her complaints of debilitating pain. Second, Bolden argues that the ALJ "failed to consider the effect of the combination of [her] limitations," including those related to obesity, dyspnea, and medication side effects. Third, she argues that the ALJ should have ordered a consultative mental examination because evidence in her record "indicated that [she] had some mental limitations." Fourth, assuming the ALJ's final RFC determination was proper, Bolden also challenges the ALJ's finding that she could return to her last CNA job as she actually performed it.

A.    *Credibility*

Bolden argues that the ALJ improperly evaluated her complaints of debilitating pain. (Pl. Br. 21.) The ALJ's evaluation necessarily involved an assessment of Bolden's credibility. It is

15

not this Court's role to determine whether Bolden was a credible witness. *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984). Rather, the court must be satisfied that the ALJ applied the correct legal standard in evaluating Bolden's credibility and that substantial evidence supports his finding that her allegations were not entirely credible. *See Craig*, 76 F.3d at 589; *Dunn v. Colvin*, 973 F. Supp. 2d 630, 640 (W.D. Va. 2013).

ALJs follow a two-step process for evaluating an applicant's statements about her symptoms, including pain. *See* 20 C.F.R § 416.929; Soc. Sec. R. 96-7p, 1996 WL 374186 (Jul. 2, 1996). First, the ALJ must "consider whether there is an underlying medically determinable physical or mental impairment . . . that could reasonably be expected to produce" the applicant's alleged symptoms. Soc. Sec. R. 96-7p, at *2. The existence of objective medical evidence that shows a medical impairment that "could reasonably be expected to produce the pain alleged" is a threshold requirement. *Craig*, 76 F.3d at 594. If such an impairment exists, the ALJ must assess the intensity and persistence of the claimant's pain and the extent to which that pain affects the claimant's ability to work. *Id.* at 595. This assessment requires the ALJ to evaluate the claimant's credibility and weigh all of the available evidence, including a claimant's subjective statements, medical history, and daily activities. *Id.* (citing 20 C.F.R. §416.929(c)(1)–(2)). "Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence." *Id.*

Ultimately, it is the ALJ's job to make findings of fact and to resolve conflicts in the evidence, including the objective medical evidence, in the record. *See Dunn*, 973 F. Supp. 2d at 638 (citing *Hayes v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)). If the ALJ makes a credibility determination, his reasoning "must be sufficiently specific to make clear" to the

claimant and to reviewing courts how and why he weighed the claimant's statements. Soc. Sec. R. 96-7p, at *4; *see also Dunn*, 973 F. Supp. 2d at 639. As long as the ALJ stayed within these bounds, I will not disturb a credibility finding that is supported by substantial evidence in the record. *See Dunn*, 973 F. Supp. 2d at 640.

Bolden claims to be disabled in part by "constant" lumbar muscle spasms and pain in her back, neck, and shoulder. She reported that she experienced considerable functional limitations (R. 39, 42, 43, 49) and that she participated in few daily activities, primarily spending her days resting (R. 42, 45, 212).

The ALJ found that Bolden's impairments "could reasonably be expected to cause some of the alleged symptoms," but that Bolden's statements "concerning the intensity, persistence, and limiting effects" of those symptoms "were not entirely credible." (R. 24.) The ALJ gave two reasons for discrediting Bolden's statements. (*See* R. 25.) First, he found that Bolden "had limited abnormalities across clinical examinations of record and diagnostic studies of record." (*Id*.) For example, Bolden consistently had "normal" range of motion in her shoulder joints and only occasionally experienced tenderness to palpation along the lumbar spine. (R. 24–25.) Imaging studies revealed some degenerative changes in the spine and right shoulder, but never any trauma or fractures. (*See id.*) Second, the ALJ found that Bolden's "treatment course [did] not suggest the presence of disabling symptoms and limitations" because she had "largely relied upon medication[] without more aggressive treatment." (R. 25.)

The ALJ may consider any medical treatment taken to alleviate pain when evaluating the applicant's credibility. *See* 20 C.F.R. § 416.929(c)(3). While there is "no bright-line rule [for] what constitutes 'conservative' versus 'radical' treatment," *Gill v. Astrue*, 3:11-cv-85-HEH, 2012

Case 4:13-cv-00032-JLK-JCH   Document 19   Filed 07/23/14   Page 17 of 31   Pageid#: 1409

WL 3600308, at *6 (E.D. Va. Aug. 21, 2012), the ALJ reasonably concluded that Bolden's treatment primarily consisted of taking medications, a course he deemed conservative.

The ALJ in this case also reasonably concluded that longitudinal clinical examinations and diagnostic tests did not corroborate Bolden's alleged symptoms and functional limitations. For example, there is no objective medical evidence that Bolden suffered "constant" debilitating lumbar muscle spasms. (R. 39, 42, 212–13, 254.) Only one healthcare provider in 18 months noted "palpable" spasms on exam. (R. 319.) Other providers expressly noted the absence of muscle spasms even when Bolden complained of having them. (*See, e.g.*, R. 882, 968, 1103; *see also* R. 1222-23.) Similarly, Bolden's lower back was "tender" to palpation on only four occasions—once each in August 2011, and April, July, and September 2012. (*See* R. 319, 968, 1103, 1131.) The tenderness was usually secondary to a distinct event, such as Bolden falling down or running out of prescription pain medication. (*See, e.g.*, R. 318–19, 1102, 968.) Medical records document no lumbar tenderness and/or no complaints of musculoskeletal discomfort across multiple physical examinations in January, March, and October 2012. (*See, e.g.*, 882, 906, 942–44, 1218, 1226, 1240.)

Bolden's shoulder range of motion tests were also inconsistent throughout 2012. Healthcare providers noted "limited" range of motion in January, April, and July (R. 906, 1031, 968), but "normal, active, full" range of motion in September, October, and December (R. 1069, 1073, 1103, 1218, 1226, 1240, 1279). These normal findings were noted even when Bolden reported persistent neck and shoulder pain. (*See, e.g.*, R. 1069, 1073.) The ALJ was not required to accept Bolden's allegation that she could not reach overhead at all (R. 43) to the extent that it was inconsistent with objective medical findings that she had normal range of motion. *See Craig* 76 F.3d at 595.

Similarly, diagnostic studies consistently showed "limited abnormalities" in Bolden's spine and shoulder. For example, multiple imaging studies revealed "at most mild narrowing" in the cervical spine (R. 1078), a "mild to moderate bulge" in the lumbar spine (R. 437), and "mild degenerative arthritis" in the right shoulder (R. 911). In January 2012, Dr. Odoo "suspected [an] injury to the rotator cuff" when Bolden first complained of difficulty lifting her right arm. (R. 918.) In September 2012, Dr. Wills noted that "arthritic changes with inferiorly directed osteophyte" in Bolden's right shoulder "can be associated with rotator cuff disease." (R. 1078.) Neither doctor recommended a particular course of treatment. (*See* R. 918, 1078.) The ALJ acknowledged these degenerative changes, but also noted that the same imaging studies never revealed any fractures, trauma, subluxation, or soft-tissue swelling in Bolden's spine or shoulder. (R. 24–25.) Weighing all of that information together, the ALJ reasonably concluded that the objective medical evidence did not substantiate Bolden's complaints of chronically incapacitating musculoskeletal pain.

The question for this Court is whether the ALJ impermissibly discredited Bolden's complaints "solely because they [were] not substantiated by objective medical evidence of the pain itself or its severity." *Craig*, 76 F.3d at 595. The ALJ in Bolden's case did not do that. (*See* R. 24–25.) Based on the ALJ's assessment of Bolden's reported symptoms and the signs and diagnostic evidence in the record, I find that the ALJ's credibility determination is supported by substantial evidence in the record. (*See, e.g.*, R. 40, 320, 886, 916, 954, 976, 983, 1031–32, 1047, 1103, 1239.)

B.    *Combined Limitations*

Bolden next argues that the ALJ's RFC determination does not reflect the "combined effects" of her back, shoulder, and breathing problems, obesity, and medication side effect of

drowsiness. (Pl. Bl. 22–23.) An ALJ must consider the combined effect of a claimant's impairments in assessing her RFC. *See* 42 U.S.C. § 423(d)(2)(B); *Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir. 1989).

The ALJ in this case found that Bolden could perform "light" work with "occasional" overhead reaching and "less than frequent" stooping or balancing, as long as she avoided "concentrated exposure to hazards." (R. 23, 27.) "Light work" involves "lifting no more than 20 pounds at a time," but "frequently" lifting or carrying objects weighing up to 10 pounds. 20 C.F.R. § 416.967(b). Work in this category often requires "a good deal of standing or walking" or "involves sitting most of the time with some pushing and pulling of arm or leg controls." *Id.*

The medical evidence in the record demonstrates that Bolden had "mild" chronic lung disease (R. 952), mild degenerative changes in her right shoulder (R. 911), and mild to moderate degenerative changes in her lumbar and cervical spine (R. 437, 911–12, 915). Multiple exams showed normal range of motion in the extremities, including her right shoulder, and intact strength. (*See* R. 319, 906, 968, 1073, 1103, 1218, 1240, 1246, 1280.) Bolden has not undergone testing of her lung function, and she has received no ongoing treatment to address any lung or breathing problems. Furthermore, no treating medical provider imposed restrictions on her functioning related to these impairments.

Bolden argues that the ALJ did not consider the effects of her obesity in combination with her other impairments. (Pl. Br. 23.) Agency regulations and rulings instruct ALJs to "consider any additional and cumulative effects of obesity" when assessing an obese person's ability to work. 20 C.F.R. § pt. 404, subpt. P, app. 1 § 1.00(Q); *see also* Soc. Sec. R. 02-1p, 2002 WL 34686281, at *1, *6 (Sept. 12, 2002). Bolden did not claim at the administrative level to be functionally limited by obesity. Nor does she point to any evidence in the record from which the

20

ALJ should have inferred that she was functionally limited by her weight. On the contrary, in April 2012, Nurse Runion recommended that Bolden, who weighed 241 pounds at the time, engage in "regular physical activity" to lose weight. (R. 1031–32.) Rather than limiting Bolden's activities, Nurse Runion encouraged her to be more active.

Although Bolden did not report any weight-related limitations, in his listings analysis, the ALJ noted that Bolden had a body mass index ("BMI") of 31 and that a person is "obese" if she has a BMI of 30 or above. (R. 23 n.1.) Moreover, the ALJ recognized his obligation to consider Bolden's obesity and its potential "adverse impact upon [her] co-existing impairments" in assessing her RFC. (R. 26; *see also* R. 23, 23 n.1.) This discussion is adequate to demonstrate that the ALJ considered the effects of Bolden's obesity. *See Reid v. Comm'r of Soc. Sec.*, --- F. App'x ---, 2014 WL 2958800, at *4 (4th Cir. Jul. 2, 2014). Given the lack of contrary evidence, I cannot find fault with the ALJ's discussion of Bolden's obesity when assessing her ability to work.

Bolden also asserts that drowsiness caused by her medications limits her functional ability. An assessment of a claimant's RFC "must be based on all of the relevant evidence in the case record," and account for "the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (*e.g.*, . . . side effects of medication)." Soc. Sec. R, 96-8p, 1996 WL 374184, at *5 (Jul. 2, 1996). However, an ALJ's failure to consider medication side effects prejudices the claimant only if the claimant provides evidence that the side effects caused some limitation in his or her RFC. *Cf. Lowery v. Comm'r of Soc. Sec.*, No. 4:10-cv-47, 2011 WL 2648470, at *4 (W.D. Va. Jun. 29, 2011) ("Plaintiff has failed to show that his . . . medication side effects create limitations which should have been included in the Law Judge's RFC finding."), *adopted by* 2011 WL 2836251 (Jul. 14, 2011) (Kiser, J.). As the Fourth Circuit noted

Case 4:13-cv-00032-JLK-JCH   Document 19   Filed 07/23/14   Page 21 of 31   Pageid#: 1413

in *Johnson v. Barnhart*, "'[d]rowsiness often accompanies the taking of medication, and it should not be viewed as disabling unless the record references serious functional limitations.'" 434 F.3d 650, 658 (4th Cir. 2005) (quoting *Burns v. Barnhart*, 312 F.3d 113, 131 (3d Cir. 2002)).

Aside from Bolden's subjective statements, which the ALJ found less than fully credible, evidence that her medications caused drowsiness consists of two doctors' notations that Bolden was drowsy or fatigued, and one of the doctors ascribed Bolden's drowsiness to her misuse of medications. (R. 1047, 1072.) Neither doctor reported any functional limitations related to drowsiness. Moreover, the ALJ restricted Bolden to work that avoids exposure to all hazards. Bolden has not explained why this restriction does not adequately address the minimal credible evidence of drowsiness.

The evidence in the record of the impairments Bolden cites in support of her argument were described as primarily mild by her treating physicians. No treating medical provider imposed any restriction on Bolden's functional activities as a result of these impairments. Given these factors, the ALJ's review of the medical evidence, and his credibility assessment of Bolden's complaints, I find that ALJ's discussion of the combined effects of Bolden's impairments was adequate and that substantial evidence supports the ALJ's determination of Bolden's RFC.

C.    *Consultative Mental Examination*

 Bolden also argues that the Commissioner should have ordered a consultative mental examination because the evidence in her record "indicated that [she] had some mental limitations." (Pl. Br. 24.) The Commissioner must purchase a consultative examination "when the evidence as a whole is insufficient to support a determination or decision on [the applicant's] claim." 20 C.F.R. § 416.919a(b); *see also Kersey v. Astrue*, 614 F. Supp. 2d 679, 695 (W.D. Va.

2009). The Commissioner's duty to develop the record does not require her to step in for the claimant's counsel when there is a "reasonably complete record" before her. *Bell v. Chater*, No. 95-1089, 1995 WL 347142, at *4 (4th Cir. Jun. 9, 1995) (per curiam) (citing *Clark v. Shalala*, 28 F.3d 828, 830–31 (8th Cir. 1994)). Thus, a "reviewing court must defer to the [Commissioner's] decision not to purchase a consultative exam when the record contains sufficient information" to decide the applicant's claim. *Johnson v. Astrue*, No. 6:11-cv-9, 2012 WL 2046939, at *3 (W.D. Va. Jun. 5, 2012).

In support of her argument for a mental examination, Bolden cites treatment notes from an October 15, 2011, emergency room visit that document an episode in which Bolden was observed "acting as if she [were] talking on a cell phone but [she] did not have a cell phone." (R. 998.) On Exam, Bolden was oriented to person, place, and time, and she was able to explain that she "sometimes" talks to her daughter even though her daughter is not there. (*Id.*) According to the physician assistant's treatment notes, Bolden had a normal psychiatric evaluation and exhibited "normal interpersonal interactions with appropriate affect and demeanor" during this visit. (*Id.*) She was instructed to follow-up with Nurse Runion and was discharged home by herself about three hours after she reported to the emergency room. (*See* R. 1002.) When she saw Nurse Runion four days later, Bolden reported that she was treated at the emergency room for pneumonia and was experiencing fever, chills, shakes, and hallucinations. (R. 860.) Bolden stated that her hallucinations resolved. (*Id.*) Nurse Runion reported that Bolden was alert, oriented, and cooperative, appeared depressed, and did not appear anxious even though Bolden complained of feeling anxious. (R. 861.) As is clear from the record, none of the medical providers who assessed Bolden noted any significant psychological findings from this episode.

The record in this case contains "sufficient, unambiguous, and non-conflicting evidence" to justify the Commissioner's decision not to purchase a consultative mental exam. *Johnson*, 2012 WL 2046939, at \*3. First, although the record contains some treatment notes that mention psychiatric symptoms, Bolden did not claim to have a medically determinable mental impairment until May 2013 when her attorney appealed the ALJ's unfavorable decision.[4] (*See*, *e.g.*, R. 68, 71, 74.) In fact, Bolden specifically denied receiving mental health treatment when state agency reviewers asked why she had included an antidepressant on her original list of medications. (*See* R. 72.)

Second, Bolden underwent a mental examination when hospitalized for bradycardia in mid-September 2012. (*See* R. 1110.) She reported "fatigue and depression" with decreased sleep and appetite, increased crying, and "passive" suicidal ideation. (*Id.*) She reported no mental health treatment beyond "being tried on" Paxil and Zoloft. (*Id.*) Bolden stated that she discontinued antidepressants a year earlier because they were too expensive. (R. 1111.) Eddie Lantz, L.P.C., observed that Bolden's "appearance was somewhat disheveled," but that she was oriented to time, place, and circumstance. (R. 1111.) He also noted that Bolden seemed to be of "average intelligence," that her "memory was generally intact," and that her thought patterns "seem[ed] to be within normal range." (*Id.*) Lantz diagnosed major depressive disorder and

---

[4] Bolden first asked for a consultative mental exam when her attorney appealed the ALJ's decision to the Appeals Council in May 2013. (R. 269.) The attorney argued that the state agency "fail[ed] to comply with 20 C.F.R. § 404.1503(e)," which, according to counsel, "requires the State agency to have a psychologist or psychiatrist review a file when there is evidence of the existence of a mental impairment." (*Id.* (citing 20 C.F.R. §§ 404.1503(e), 416.903(e).) He also submitted hospital records dated April 1, 2013, as evidence that "Bolden has a past history of depression." (R. 270.) Those records, according to Bolden's attorney, show that Bolden presented to Virginia Baptist Hospital "three days after attempting to commit suicide by taking 13 Neurontin tablets and then [trying] to vomit them up." (*Id.*) The Appeals Council returned the records without considering them because the ALJ decided Bolden's case through March 14, 2013, and "this new information [was] about a later time." (R. 9.)

24

prescribed Celexa. (*See id.*) On discharge, Dr. Farmer recommended that Bolden "follow up with Crossroads to establish herself with mental health to help manage her coping skills." (R. 1047.) No evidence in the record shows that Bolden established care with a mental health provider. Nor did she report using Celexa when the ALJ asked about her medications. (*See* R. 39–41.)

Third, Dr. Linda Dougherty, Ph.D., reviewed Bolden's file in January 2012 as part of the state agency's initial disability determination. (*See* R. 74–75.) Although Bolden "d[id] not allege a mental impairment" at the time, Dr. Dougherty observed that there was "a note of use of Zoloft in [Bolden's] application and there [was] a mention of anxiety and depression in her record and a note of []depressed mood in her hospitalizations." (R. 74.) She concluded that Bolden's anxiety and affective disorder were "non-severe" impairments because they "mild[ly]" interfered with her daily activities, social interactions, and concentration, persistence, or pace. (R. 74–75.) A second state-agency reviewer, Dr. Stephen Saxby, Ph.D., agreed with those conclusions after reviewing Bolden's file in April 2012. (R. 86.)

Although the ALJ must sufficiently develop the record, Bolden carried the burden of proving the existence of a mental impairment. *See Bell*, 1995 WL 347142, at *4. The ALJ in this case "had before him sufficient facts to determine the central issue of disability" based on Bolden's alleged impairments. *See id.* at *4-5. Thus, I find that the Commissioner was not required to obtain a mental exam. Moreover, any error on this issue is harmless. Bolden's attorney has not explained how a consultative mental exam might have produced a "different administrative conclusion" in her case (*see, e.g.*, Pl. Br. 24; R. 269–70). *Kersey*, 614 F. Supp. 2d at 696 (defining the harmless-error standard in social security disability cases).

*D.      Ability to Perform Past Work*

Finally, Bolden argues that substantial evidence does not support the ALJ's finding that she can return to her past work as a CNA. (Pl. Br. 23–24.) The claimant bears the burden of persuading the Commissioner that she cannot perform her past work "either as [she] actually performed it" or as it is "generally performed in the national economy." *Goodman v. Astrue*, 539 F. Supp. 2d 849, 850 (W.D. Va. 2008) (citing 20 C.F.R. §§ 416.920(f), 416.960(b)). An ALJ must make specific findings on the record as to: (1) the person's RFC; (2) the physical and mental demands of the past job or occupation; and (3) whether the person's RFC would permit him or her to return to the past job or occupation. *Prim v. Astrue*, No. 7:07-cv-213, 2008 WL 444537, at *6 (W.D. Va. Feb. 13, 2008). Although a VE's testimony can inform the ALJ's findings on the second and third issues, the ALJ cannot "simply delegate[] his fact finding responsibly to a VE" at this stage. *Id.* at *7 (citing *Bailey v. Comm'r of Soc. Sec.*, 173 F.3d 428 (6th Cir. 1999); *Winfrey v. Chater*, 92 F.3d 1017, 1025 (10th Cir. 1996)).

Binding agency rules set out "thorough standards of inquiry," *Woody v. Barnhart*, 326 F. Supp. 2d 744, 750 (W.D. Va. 2004), in order to resolve this potentially controlling "issue as clearly and explicitly as circumstances permit," Soc. Sec. R. 82-62, 1982 WL 31386, at *3 (Jan. 1, 1982). The ALJ must "show clearly how specific evidence leads to a conclusion," and that conclusion "must be developed and explained fully." *Id.* at *4.

Bolden reported only one job on her work history report. (*See* R. 203.) She wrote that she last worked in 2005 as a CNA for a medically dependent child in a wheelchair. (*Id.*) This job required Bolden to walk, stand, sit, climb, stoop, crouch, and "frequently" lift between 20 and 25 pounds. (R. 204.) Bolden wrote that she left this job after two months "because of [her] back." (*Id.*) The ALJ did not ask any questions about this job's physical or mental demands. The VE

26

asked what was the "heaviest lifting [Bolden] had to do" in this job. (R. 51.) Bolden said that she

had to lift "a little bit more" than "about 20 pounds." (*Id.*) Bolden denied that she ever had to lift

50 or 100 pounds, and she described performing minimal activities of preparing food and sitting

with a terminally ill patient in her last few jobs. (R. 55.)

The VE testified that this semiskilled CNA job "appeared to have been light work." (R.

54.) He added that light work was "a little unusual for a CNA, but given the circumstances, that's

probably accurate." (*Id.*) The VE also cautioned that he did not have enough information to say

whether Bolden could physically perform "any of [her] past work" because he only had records

for this most recent CNA job. (*Id.*) The ALJ then asked the VE whether a person could perform

"any of Ms. Bolden's past work" if she: (1) was "limited to light work as it's defined in the

regulations and rulings which generally means lifting up to 25 pounds occasionally [and] 10

pounds frequently"; (2) could sit, stand, and walk for about six-hours; (3) could engage in

"postural activities [including] stooping and balanc[ing] . . . on a less than frequent basis"; (4)

could occasionally reach overhead with both arms; but (5) must avoid concentrated exposure to

hazards. (R. 55.) The VE testified that this person could do Bolden's past CNA job "as she

performed it on occasion" because it "appear[ed] to have been light" work. (R. 55–56.) He added

that this person could not be a CNA as that occupation "is normally performed." (R. 55.)

In his written decision, the ALJ found that Bolden could perform "light work as defined

in 20 C.F.R. § 416.967(b) insofar [as] she is able to lift 20 pounds occasionally and 10 pounds

frequently"; to sit, stand, and walk for about six hours in an eight-hour day; to occasionally reach

overhead; to "engage in postural activities, to include stooping and balancing, on a less frequent

basis"; and must avoid concentrated exposure to hazards. (R. 23.) At step four, the ALJ

concluded that Bolden "could still perform the CNA job as actually performed, consistent with

27

the testimony of the vocational expert at the hearing." (R. 27.) He noted that the VE "testified that [Bolden] could still perform this job[] given the above-described [RFC]" because she performed "this job at the light exertional level." (R. 26.) The ALJ noted that this job was semiskilled, but did not make any other factual findings about the physical or mental demands of Bolden's last CNA job. (*See* R. 26–27.)

The ALJ's analysis falls far short of the "thorough standards of inquiry" set out in Social Security Ruling 82-62. *Woody*, 326 F. Supp. 2d at 750; *see also Prim*, 2008 WL 444537, at *7. First, the ALJ only made specific factual findings about Bolden's RFC. (R. 23.) Beyond paraphrasing the VE's testimony that Bolden "performed this [CNA] job at the light exertional level," the ALJ did not make any findings about the job's actual physical or mental demands. (R. 26.) His conclusion that Bolden could return to this CNA job because "it does not require the performance of work related activities precluded by" her RFC simply adopts the VE's conclusory testimony on that point.

Second, The VE's "bare bones testimony," *Prim*, 2008 WL 444537, at *6, does not provide "such relevant evidence as a reasonable mind might accept as adequate to support" the ALJ's potentially dispositive conclusion. The VE testified that Bolden's last CNA job "appeared to have been light work" because the "heaviest" thing she had to lift weighed "a little bit more" than 20 pounds. (R. 52, 54.) Neither the ALJ nor the VE asked about the weight Bolden "frequently" or "occasionally" lifted or carried. On her work-history report, Bolden said that she "frequently" lifted between 20 and 25 pounds while caring for the medically dependent child. (R. 204.) Nothing in the record contradicts Bolden's allegations that she was "frequently" required to lift *more than* 20 pounds at one time. This amount of lifting exceeds "light work" as it is defined in the regulations. *See* 20 C.F.R. § 416.967(b).

28

Bolden also said that this job required her to sit, walk, stand, stoop, and crouch (R. 204) because "basically [she] had to do everything" for the disabled child in her care (R. 52, 204). However, the ALJ did not ask Bolden how often she was required to engage in these exertional and postural activities. Rather, the VE apparently assumed that this particular CNA job would accommodate someone who could sit, stand, and walk for "about six hours," only "occasionally" reach overhead, and stoop on a "less than frequent" basis. (R. 55.) Thus, neither the VE's testimony nor the ALJ's decision contains the level of specificity contemplated by Social Security Ruling 82-62. *See Prim*, 2008 WL 444537, at *7 (citing *Winfrey*, 92 F.3d at 1025 ("When, as here, the ALJ makes findings only about the claimant's limitations, and the remainder of the step-four assessment takes place in the VE's head, we are left with nothing to review.")).

This error would have warranted remand for further fact finding had the ALJ denied benefits at step four. *See, e.g.*, *DeLoatch v. Heckler*, 715 F.2d 148, 151 (4th Cir. 1983); *Woody*, 326 F. Supp. 2d at 751-53; *Prim*, 2008 WL 444537, at *8. But the ALJ, relying on the VE's testimony, also found that Bolden's age, education, work history, and RFC allowed her to perform three other light duty occupations that existed in the national economy. (R. 27.) This finding at step five is supported by substantial evidence. *See Walls v. Barnhart*, F.3d 287, 291–92 (4th Cir. 2002) (holding that a VE's reliable testimony constitutes substantial evidence that will support a denial of benefits at step five). Thus, because the ALJ's final RFC determination is supported by substantial evidence, I find it "inconceivable" that a proper step four analysis would have produced a "different administrative conclusion" in Bolden's case. *Kersey*, 614 F. Supp. 2d at 696.

## V. Conclusion

This Court must affirm the Commissioner's decision if it is supported by substantial evidence in the record and was reached through the correct application of the law. The Commissioner's step five decision that Bolden can perform certain light duty occupations that exist in the national economy satisfies both requirements. Therefore, I **RECOMMEND** that this Court **DENY** Bolden's Motion for Summary Judgment (ECF No. 14), **GRANT** the Commissioner's Motion for Summary Judgment (ECF No. 17), and **DISMISS** this case from the active docket.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: July 23, 2014

30

Joel C. Hoppe
United States Magistrate Judge